GENEVA MINERAL SPRINGS CO., Limited, v. COURSEY et al.

(Supreme Court, Appellate Division, Fourth Department.   November 22, 1899.)

1. CORPORATIONS—STOCK ACTUALLY PAID IN—COMPUTATION.
    Payments for capital stock of a corporation represented by expenditures
in developing property before it was organized, the benefits of which are
received by it, and which expenditures would doubtless have been neces-
sary if the stock had been otherwise paid for, may be computed in de-
termining the stock actually paid in.

2. SAME—CORPORATE EXISTENCE—ESTOPPEL TO DENY.
    One who has repeatedly recognized a corporation de facto, and to some
extent directed its affairs as an officer, cannot, when sued by it, assert
that it lacked corporate existence, or had lost its corporate life, by neglect
to exercise its functions, or by a sale of all its tangible property.

3. SAME—CONTINUANCE.
    A corporation once legally created continues, in the absence of some
express statute, until either its charter period has expired, or its dissolu-
tion has been judicially declared.

4. STATUTE OF FRAUDS—PLEADING—NECESSITY.
    The statute of frauds must be pleaded to be available as a defense.

5. SAME—ESTOPPEL.
    One who assisted in organizing a corporation, and then consented that it
might take the place of himself and co-lessees in developing a well, which
it did, is estopped to assert that the assignment of their rights to it was
invalid because it did not comply with the statute of frauds.

6. SUBTERRANEAN WATERS—LEASE OF RIGHT TO BORE WELL—CONSTRUCTION—
    ESTOPPEL.
    Under a lease entitling the lessees to bore for gas, oil, or "other miner-
als," a well was drilled, and found to produce mineral waters possessing
valuable curative properties.  Thereupon a corporation was organized to
develop it, one of the lessees, as an incorporator, certifying, in effect,
that its business was to deal in mineral water, and supply it for consump-
tion.  Held, that the certificate amounted to an admission that the lease
included within its terms mineral waters, and that he would not be per-
mitted to assert that it did not when sued by the corporation to recover
possession of the well, which it claimed under an assignment from him
and his co-lessees.

7. LEASE—CONSTRUCTION—AFTER-ACQUIRED PROPERTY.
    A demise without restriction as to lessor's interest or title embraces
whatever interest he has, or may afterwards acquire in the demised
premises.

8. REVIEW—CONFLICTING EVIDENCE.
    Where the evidence is conflicting, it will not be weighed on appeal from
a judgment entered on a referee's report.

Appeal from judgment on report of referee.

Action by the Geneva Mineral Springs Company, Limited, against
Stephen Coursey, impleaded with others.  Judgment for plaintiff
entered on the report of a referee, and defendant Coursey appeals.
Affirmed.

The plaintiff, alleging that it is a corporation duly created by and existing
under the laws of this state, brings this action to recover the possession of
certain property consisting of a flowing well of mineral water, a bath house,
pumps, machinery, and fixtures, all of which were located upon certain prem-
ises in the village of Geneva, N. Y., more particularly described in the com-
plaint herein, and which property, it is claimed, was wrongfully and unlawfully
seized and taken from the possession of the plaintiff by the defendants.  The
plaintiff asks that a certain lease, and a right to the possession of the prem-
ises therein described, and the beneficial enjoyment of the property therein

mentioned, may be decreed to belong to and be in the plaintiff. The complaint also demands that the appellant, Coursey, account to the plaintiff for moneys received by him by way of rents and royalties, which moneys he has applied to his own use and benefit under an arrangement entered into between him and certain of the other defendants herein. The defendants, by different attorneys, interposed separate answers to the plaintiff's complaint, and the issues thus joined were tried before a referee, who reported in favor of the plaintiff, and from the judgment entered upon such report the defendant Stephen Coursey alone appeals.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and SMITH, JJ.

Louis Marshall, for appellant.

John Gillette, for respondent.

ADAMS, J. The appellant, who, from the commencement of this action, has apparently been the party more directly interested than either of his co-defendants in defeating the plaintiff's right to recover, rests his defense upon four distinct propositions, viz.: (1) That the plaintiff, never having been duly organized as a corporation in pursuance of the requirements of chapter 611 of the Laws of 1875, has no legal existence, and consequently no capacity to sue; (2) that its corporate existence, if any was ever acquired, has terminated in consequence of the abandonment of the enterprise for which it was created, by the failure of its officers and stockholders to hold meetings, by the sale of all its tangible property under execution, and by the nonuser of its corporate franchises; (3) that the plaintiff never acquired any right, title, or interest in or to the spring which is the subject-matter of this litigation, nor in or to any lease of the premises upon which the same is located; and (4) that, even though the plaintiff may have acquired such rights as were granted by the lease in question to the original lessees, it did not acquire any right to the mineral water flowing from the well upon the leased premises, which, it seems, has proved to be of considerable value.

In order to determine what force, if any, there is in these various contentions of the appellant, it becomes necessary to advert to some of the leading facts of the case as they have been established by the learned referee. It appears that in the year 1885 the appellant, Stephen Coursey, was the owner of an undivided interest in the premises in question, and that on or about the 1st day of December of that year he executed and delivered a lease of the entire premises "for the purpose of mining or boring for oil or other minerals for the term of twenty years, or as long as found in paying quantities." This lease ran to the lessor, Stephen Coursey, as one of the lessees, and to A. J. Eshenour and Charles A. Steele, as co-lessees, and it provided that, in case gas should be found in paying quantities, and the lessees should desire to convey the same to villages and towns for heating and illuminating purposes, they should pay the lessor for each well used for that purpose. After the execution and delivery of this lease, the lessees therein named obtained subscriptions from various persons and in various sums, amounting in the aggregate to about $2,500, for the purpose of drilling a well upon the leased premises, and prospecting for oil or gas; and shortly thereafter a contract was

entered into between one A. D. Branch and the lessees for drilling a well upon the leased premises, and such well was thereupon drilled, and the expense thereof was paid by the appellant, Coursey, from moneys received from the several subscribers. After proceeding to a certain depth, a vein of water was struck, which, upon careful analysis, was found to possess valuable medicinal properties, and the parties interested in the well thereupon considered the advisability of suspending their effort to obtain either gas or oil, and utilizing this mineral water as an article of commerce. To this end an assessment of 12 per cent. upon the amounts subscribed was made, and the same was paid by the various subscribers to the appellant, Coursey, as treasurer of the fund. A meeting of the subscribers was thereafter called, and steps were taken to form a corporation for the purpose of securing and selling the mineral water obtained from the well, and it was thereupon understood and agreed by the lessees, Eshenour, Steele, and Coursey, that, in the event such corporation was formed, the lease of the lands and premises from which the mineral water was obtained should belong to and become the property of the corporation. Thereafter, and on the 18th day of September, 1886, a certificate for the formation of such corporation was filed in the office of the secretary of state. This certificate, which was signed by the lessees, Eshenour, Steele, and Coursey, set forth the facts required by the statute, viz. the name of the corporation, the object for which it was to be formed, including the nature and location of its business, the amount of its capital stock (which was to be $3,000, divided into 120 shares of $25 each), the location of its principal business office (which was to be the village of Geneva, Ontario county, N. Y.), and the duration of the corporation (which was to be the term of 50 years). The certificate was also duly acknowledged by the parties signing the same, and upon the filing thereof a license was duly issued by the secretary of state to the persons named therein, empowering them, as commissioners, to open books for subscription to the capital stock of such corporation at such times and places as they might determine. Subsequently, and upon the 14th day of October, 1886, a certificate was made by the secretary of state, declaring that the corporation was fully organized in accordance with the provisions of chapter 611 of the Laws of 1875. The capital stock of such corporation was thereupon issued to the extent of $2,500, and certificates thereof were delivered to the various parties who had subscribed to the fund raised for the purpose of defraying the expenses of drilling the well in proportion to the amounts severally subscribed by them, and the additional $500 of stock was sold, and the avails thereof paid over to the appellant, Coursey, as treasurer of the corporation. Immediately upon completing its incorporation, the plaintiff took possession of the land and premises upon which the well was located, and also of the various improvements which had been made thereon, and proceeded to conduct the business of securing and selling the water obtained from the well, and of furnishing facilities for bathing therein, and to that end it erected a bath house, and expended considerable sums of money in other improvements and in advertising and introducing its water to the public; and this business was thus carried on until

about the month of December, 1889, the same being conducted mainly by the appellant, Coursey, as treasurer, and Charles A. Steele, as president, of the corporation. The business, however, did not prove as successful as was anticipated, and in October, 1887, the property belonging to the corporation was sold under an execution, and bid in by the wife of Charles A. Steele, and thereafter the business was conducted by her and her husband, but apparently with the consent and assistance of the appellant, Coursey, under the plaintiff's corporate name, save that the word "Limited" was, upon the advice of counsel, omitted therefrom. In the meantime nearly all of the persons who had become stockholders by virtue of their subscriptions towards the expense of drilling the well had transferred their stock or interest to either Steele or Coursey, who, with Mrs. Steele and one or two others, were about the only persons who retained any interest in the company. No formal meetings of either stockholders or directors were had, but such of the stockholders as were left appeared to have acquiesced in whatever was done by either or both of the managing directors. On the 19th day of December, 1889, the appellant served a written notice upon Steele, requiring him to deliver up possession of the premises in question, and subsequently he took possession thereof, and of all the property and improvements thereon, and assumed absolute control over the same. Thereafter, and on or about the 3d day of October, 1892, he executed to one Calvin E. Linch, for the term of 25 years, a lease of these same premises, in which he reserved to himself the annual rental of $6,000, and a royalty of 1 cent for each gallon of water drawn from the spring and shipped from the village of Geneva, and 5 cents for each bath given therein in the village of Geneva. The appellant's wife joined in this lease, and the same was executed and acknowledged without the consent of the plaintiff. Linch went into the immediate possession and occupancy of the lands and premises covered by the lease, and disposed of the waters taken from the well, paying to Coursey and his wife the rents and royalties reserved to them in the lease until on or about the 10th day of January, 1894, when, with the consent of Coursey and his wife, he assigned and transferred such lease to the defendant Edward H. Quantin. At about the time of the assignment of the lease by Linch to Quantin, the defendant the Geneva Mineral Water Company was incorporated under the laws of this state, the object of such incorporation, as stated in the certificate thereof, being virtually the same as that for which the plaintiff was incorporated; and thereafter, and on or about the 15th day of January, 1894, the appellant, Coursey, and the defendant Thomas Coursey and his wife, without the knowledge or consent of this plaintiff, executed and delivered to such new corporation a lease of the lands and premises, and of the well and erections and improvements thereon, for the term of 50 years, reserving to themselves an annual rental of $6,000, payable in quarterly payments in advance, and a royalty of 1 cent for each gallon of water which might be taken from the spring and shipped out of the village of Geneva after January 15, 1896. The lease was executed and delivered to the new corporation with the knowledge and consent of both Linch and Quantin, the former being one of its directors and

the latter its secretary. Immediately upon the execution of such lease the Geneva Mineral Water Company entered upon and took possession of all the property covered thereby, and ever since has been, and is now, disposing of the waters from the well, realizing large profits therefrom, from which the rents and royalties reserved in the lease have been paid over to the lessors in accordance with its terms and requirements.

The foregoing statement of facts embraces the main features of the case, although there are many other circumstances revealed by the record which possess more or less significance, and to some of these reference will be made later on. We think, however, that sufficient already appears to negative the appellant's first proposition that the plaintiff never had any corporate existence, for the steps taken to accomplish that result certainly appear to have been in strict accord with the requirements of the statute, and the undisputed evidence tends to show that not only 10 per cent., but the entire amount, of the plaintiff's capital stock was actually paid in. It is true that all but $500 thereof had been received from the subscriptions and expended in developing the well prior to the filing of the articles of association; but the plaintiff had the benefit of such expenditure, and would doubtless have used whatever might have been realized upon a sale of its capital stock for the same purpose if the work of development had not already been performed. But, even if it could be said that there had not been a strict compliance with all the requirements of the statute, we do not see how that fact would be available to the appellant as a defense to this action, for he was one of the parties to the articles of association upon the filing of which the corporation was formed, and in pursuance of which it has assumed to exercise the franchises and functions of a regularly constituted corporation. It was, consequently, a corporation de facto, if nothing more, and, inasmuch as it was repeatedly recognized as such by the appellant, who, to some extent at least, directed and controlled its affairs, it now ill becomes him to assert a lack of corporate existence. Railroad Co. v. Kyle, 64 N. Y. 185; Vinegar Co. v. Schlegel, 143 N. Y. 537, 38 N. E. 729.

For much the same reason we think the appellant has estopped himself from asserting that whatever corporate life the plaintiff once possessed has been lost by the failure to exercise its corporate functions, or by a sale of all of its tangible property. In saying this it may be assumed that the reasons urged by the appellant in support of his contention actually existed; that for a long period of time the plaintiff did omit for some reason to make use of its corporate franchise; that from the latter part of 1886 until some time in 1894 no meetings of either directors or stockholders were held; that no reports were made, and no officers elected; moreover, that in 1887 all the tangible property of the plaintiff was sold upon execution. And yet either or all of these facts did not necessarily work a dissolution of its corporate existence, for, having once been legally created, it cannot cease to exist of its own volition; neither can its life be destroyed by the acts or omis-

sions of one or all of its officers. Its functions may be suspended, and, so far as accomplishing that for which it was created is concerned, it may become dormant; but, in the absence of some express statutory provision, its life continues until either its charter period has expired, or the court has decreed a dissolution. Brooklyn Steam-Transit Co. v. City of Brooklyn, 78 N. Y. 524–529; People v. Ballard, 134 N. Y. 269, 32 N. E. 54; People v. Twaddell, 18 Hun, 427; Ang. & A. Corp. §§ 138, 771. But, even were this not the rule, the appellant, as has already been suggested, is in no situation to insist that the plaintiff is no longer a legal entity; for, notwithstanding its failure to elect officers, or make reports, or hold meetings, it was during this long period of inactivity transacting more or less business with the knowledge, consent, and privity of the appellant. In the conduct of its business it advertised the waters obtained from the well in its corporate name, and sold such waters as the property of the corporation. It also contracted debts in its corporate name. Its property was assessed to it in its corporate name upon the assessment rolls of the town and village; the appellant being one of the assessors by whom such assessments were made. It was sued and judgments were obtained against it in its corporate name, and, in short, it held itself out to, and was well known by the public as, a corporation. Furthermore, during this entire period of time the appellant acted as secretary or treasurer of the plaintiff. On the 8th day of November, 1887, as such treasurer, he verified an answer in an action brought against the corporation, which admitted that the defendant therein (this plaintiff) was a domestic corporation. On the 6th day of October in the same year he united with Steele in a written consent that the corporation might mortgage its real and personal estate to secure himself and Steele for the sum of about $1,600 advanced by them to the corporation, and thereafter, as treasurer, joined in the execution of such a mortgage; and the evidence tends to show, and is sufficient to support a finding to that effect, that the property of the corporation was sold upon an execution in furtherance of a scheme to which both Steele and Coursey were parties; that, in pursuance of this scheme, it was purchased by Mrs. Steele, to whom the money was furnished for that purpose by Coursey; and that the business was thereafter carried on in the manner heretofore described with his knowledge and approval. There is also some evidence tending to prove that during this same period an assessment was made upon the plaintiff's stockholders of 50 per cent., and that this assessment was paid, by a portion at least of the stockholders, one or more of whom paid his assessment to the appellant. Thus it will be seen that in various ways and at different times the appellant was by his acts and declarations admitting and asserting that the plaintiff was a duly-organized and living corporation; and, this being so, he ought not now to be permitted to dispute that fact. Warehousing Co. v. Badger, 67 N. Y. 294; Bank v. Pfeiffer, 108 N. Y. 242, 15 N. E. 311.

It is insisted, however, that, even conceding the validity of the plaintiff's incorporation, and that its right to exercise its corporate

functions had not terminated, the plaintiff ought not to maintain this action, for the reason that it has never acquired any right or title to the water flowing from the well in question, inasmuch as such right or title is an interest in lands, which can be acquired only by deed or conveyance in writing. In short, the appellant's contention is that the assignment to the plaintiff of the lease from Coursey to Steele and others is void within the statute of frauds, because not in writing and under seal. To this contention, however, there are, as we think, several obvious and complete answers. In the first place, the defendants omitted to set up the statute of frauds in their answer, and, consequently, within well-settled rules of procedure, it is not now available to them, or either of them, as a defense. Matthews v. Matthews, 154 N. Y. 288, 48 N. E. 531; Deering v. Hardware Co., 33 App. Div. 31, 53 N. Y. Supp. 513. In the second place, the transfer or assignment to the plaintiff of whatever rights or interests the lessees mentioned in the lease obtained by virtue of that instrument, although by parol, was fully executed by the plaintiff's entering into the possession of the demised premises, and using them for the purpose and in the manner contemplated by the lease, with the knowledge and consent of the lessor, who, in his dual capacity of lessor and lessee, not only impliedly assented to the transfer, but was also quite ready, apparently, to receive any benefit which might result from the assignee's operations and explorations for subterranean products. In these circumstances it is exceedingly doubtful whether the defense now sought to be interposed would be available had it been pleaded. Tallman v. Earle (Com. Pl.) 13 N. Y. Supp. 805, and cases cited; Sherman v. Engel, 18 Misc. Rep. 484, 41 N. Y. Supp. 959. But, even if it be admitted that the appellant's contention that an assignment of the lease could not, within the statute of frauds, be effected by parol, is well founded,—as to which there is perhaps some doubt (Fryer v. Rockefeller, 63 N. Y. 268; Currier v. Howard, 14 Gray, 511),—he should not be allowed, under the circumstances of this case, to invoke the statute to aid him in perpetrating a fraud, as certainly would be the case if, after uniting in the effort made to accomplish the plaintiff's incorporation, and then consenting that it might take his place and that of his co-lessees in developing the well, he is permitted to assert that the assignment is invalid. Wood v. Rabe, 96 N. Y. 414. That it was the intention of all the parties to the lease that it should be transferred to the plaintiff as soon as its incorporation was duly effected, and that such intention was subsequently carried into effect, are facts concerning which there can be no question. Indeed, we think it may be safely assumed that, but for such understanding no attempt would have been made to procure the plaintiff's incorporation.

The learned counsel for the appellant has elaborated his fourth proposition with much care, and argues at great length that, inasmuch as water is not a mineral, the right conferred by the lease in question is simply the right to mine or bore for oil, gas, or "other minerals," and that these words should receive a technical and restricted interpretation, and not one which would include mineral

water. This contention is amply fortified by authorities and citations which would be entitled to much more serious consideration if the appellant himself had not given a practical construction to the language of the lease, and one which is quite the reverse of that contended for by his counsel. In the certificate which was the initial step taken to secure the incorporation of the plaintiff the object and nature of the business for which such incorporation was sought were stated to be:

"For bottling and selling natural mineral waters and for the purpose of accumulating, storing, conducting, selling, furnishing and supplying water for mining, domestic, manufacturing, municipal and agricultural purposes and for the purpose of furnishing water for bathing and for curative purposes, and for drinking as a beverage and for medicine, and for all medicinal purposes."

This certificate was signed by all three of the parties to the lease, and at the time it was so signed and filed in the office of the secretary of state the well had been drilled, and it had been ascertained by careful experiment and use that the waters thereof possessed valuable curative properties; and without doubt it was to reap such commercial benefit as might accrue from their sale and consumption that incorporation was sought. This certainly was tantamount to an understanding and admission upon the part of the appellant that the lease which, as we have seen, formed the basis of, and constituted the only inducement for, the plaintiff's incorporation, included within its terms mineral water as well as the substances more specifically mentioned therein; and, in view of this fact, it is rather late in the day to ask the court to give to its language any other or different construction.

It is further claimed by the appellant that the learned referee erred in finding that the appellant should account to the plaintiff for five-sixths of the rents and royalties received by him under his lease to Calvin E. Linch and the Geneva Mineral Water Company, inasmuch as at the time of the execution of the lease which is the subject-matter of this action he was the owner of but eleven-eighteenths of the property embraced therein. It will be seen, however, by reference to that instrument, that the appellant assumed to lease all the premises mentioned therein, and described as "Coursey's Mill Lot." What the exact interest of the lessor in those premises was at that time is not stated in the lease, but it does appear by his own admission that at the time of the trial he was the owner of an undivided five-sixths interest therein; and, inasmuch as the demise was without words of restriction as to the lessor's interest or title, we think that within well-settled principles it must be regarded as embracing whatever interest he then had or might thereafter acquire in the demised premises. Jackson v. Murray, 12 Johns. 201; French v. Spencer, 21 How. 228–240; Tefft v. Munson, 57 N. Y. 97; Austin v. Ahearne, 61 N. Y. 6; Badger v. Holmes, 6 Gray, 118.

The counsel upon either side of this case has been unsparing in his criticism of the evidence of the adverse party, and it is impossible to read the evidence contained in the record without reaching the conclusion that such criticism is quite justifiable. Indeed,

the case is so full of contradictions and equivocations that a mere casual examination thereof forces upon the mind the conviction that the principal witnesses were influenced in their testimony more by a desire to advance their individual interests than to adhere to a truthful narration of the facts and circumstances which they assumed to detail. As a consequence, the evidence before us is not only conflicting as between the parties, but that of each of the principal witnesses is in direct conflict with evidence relating to the same subject given by himself on some former occasion. The case therefore is, at best, a doubtful one, and it is consequently one in which this court will not assume the place of the referee, and determine upon conflicting evidence who has told the truth or is best entitled to credit. Roosa v. Smith, 17 Hun, 139; Penfield v. Sage, 71 Hun, 573, 24 N. Y. Supp. 994; Irlbacker v. Roth, 25 App. Div. 290, 49 N. Y. Supp. 538; O'Neill v. Barry, 20 App. Div. 121, 46 N. Y. Supp. 752. We conclude, therefore, that the judgment appealed from should be affirmed.

Judgment affirmed, with costs. All concur.